UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NAACP CONNECTICUT STATE CONFERENCE, JUSTIN FARMER, GERMANO KIMBRO, CONLEY MONK, JR., GARRY MONK, and DIONE ZACKERY,<br><br>*Plaintiffs*,<br><br>v.<br><br>DENISE MERRILL, SECRETARY OF STATE, and DANNEL P. MALLOY, GOVERNOR,<br><br>*Defendants*. | Civil Action No. _____<br><br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## INTRODUCTION

1.      Connecticut's state legislative redistricting plan, adopted in 2011 and scheduled for use in the 2018 and 2020 elections, violates the "one person, one vote" requirement of the Fourteenth Amendment because the plan is based on unlawful prison gerrymandering.

2.      "Prison gerrymandering" is the practice whereby Connecticut counts incarcerated people as residing in the state facility where they are imprisoned, rather than at their pre-incarceration address, for the purpose of drawing lines for state legislative districts.

3.      Connecticut's prisoners are disproportionately African-American and Latino, and many maintain a permanent domicile in the state's urban centers. Nevertheless, many of these individuals are incarcerated in correctional facilities that the State has located primarily in rural, lightly populated, predominantly white parts of Connecticut.

4.      Persons incarcerated in districts far from their home communities have no meaningful connection to the towns in which they are incarcerated. They are separated from their families and friends and have little contact with citizens residing immediately outside the walls of the prisons. Incarcerated persons cannot visit or patronize public or private establishments, such as parks, churches, businesses, or public transportation, in their surrounding communities.

5.      Moreover, most Connecticut prisoners cannot vote under state law and have no contact with the representatives of the districts in which they are incarcerated. Local legislators do not visit prisoners incarcerated in their districts. Consequently, the districts' representatives do not, in practice, represent these incarcerated persons or perform legislative services for them.

6.      Despite the welcome decline in the State's overall prison population, the disproportionate incarceration of African-American and Latino residents, and their confinement in distant, predominantly white districts, harms the communities they leave behind, as well. The voting power of these communities is diluted when incarcerated persons are removed from the apportionment base. Families bear severe emotional and financial hardships, neighborhoods experience economic and social instability, and entire communities lose their voice in state affairs when fathers, sons, daughters, and mothers are shipped to remote, rural prisons.

7.      The Supreme Court has long recognized that variations of ten percent or more in the population of electoral districts raises constitutional concerns under the "one person, one vote" requirements of the Fourteenth Amendment.

8.      Because Connecticut counts prisoners where they are incarcerated rather than where they permanently reside, the actual number of constituents (exclusive of prisoners) in as many as nine Connecticut House districts is more than ten percent smaller than the number of

constituents in the State's largest House district. The number of constituents in one Senate District is more than nine percent smaller than the largest Senate district.

9.     Permanent residents of the prison-gerrymandered districts thus have more influence over local affairs and greater voting power than residents in other districts, particularly in the urban districts that many prisoners call home.

10.     Defendants' prison gerrymandering violates the "one person, one vote" principle of the Fourteenth Amendment to the United States Constitution. It impermissibly inflates the voting strength of predominantly white voters residing in certain Connecticut House and Senate Districts, as compared to the voting strength of persons residing in all other House and Senate districts.

11.     By counting prisoners in the districts where they are imprisoned instead of their pre-incarceration residences, prison gerrymandering dilutes the votes of residents in their home communities, who are disproportionally African-American and Latino, as compared to residents in other communities and districts.

12.     Plaintiffs seek a declaration that Defendants' prison gerrymandering violates the Fourteenth Amendment to the U.S. Constitution and an injunction against the use of the 2011 Redistricting Plan in the 2020 elections.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1357. This suit is authorized by 42 U.S.C. § 1983.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiffs NAACP Connecticut State Conference, Justin Farmer, Germano Kimbro, Conley Monk, Jr., Garry Monk, and Dione Zackery and all Defendants reside in the District of Connecticut, the

facts that give rise to this suit occurred in the District of Connecticut, and no real property is involved in this dispute.

15.     This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

16.     Plaintiff National Association for the Advancement of Colored People ("NAACP") is a non-profit, non-partisan corporation with over 300,000 members, including approximately 5,000 members residing in Connecticut, many of whom are registered to vote. Many NAACP members in Connecticut who are registered voters reside in state legislative districts that are overcrowded as a result of prison gerrymandering, as set forth below.

17.     The NAACP works to enhance civic engagement among African American communities by increasing voter registration and through get-out-the-vote efforts. In its national get-out-the-vote effort in 2016, the NAACP targeted fifteen states, including Connecticut, which in 2012 had lower than expected African American voter turnout, with a campaign titled "Our Votes Matter." The NAACP relies on a fair and effective electoral process to help achieve its organizational missions of improving civic engagement, education, criminal justice, environmental justice, economic opportunity, and healthcare.

18.     Members of the NAACP pay dues, elect the members of the NAACP Board of Directors, and are eligible, if elected, to serve on the NAACP Board of Directors. The NAACP's policies and procedures are established at an annual national convention by voting delegates representing each NAACP State Conference, Local Branch, and Youth Unit, elected by the members of those units.

19.     In addition, the NAACP has had to divert organizational resources, including staff time, travel expenses, and other costs, to address unlawful prison gerrymandering in Connecticut.

20.     The NAACP brings this action in its representative capacity on behalf of its members who are adversely affected by the unequal population of the legislative districts created by the 2011 Redistricting Plan, and in its organizational capacity.

21.     Plaintiff Connecticut State Conference of the National Association for the Advancement of Colored People ("NAACP-CT") is a non-profit, non-partisan organization with nearly 5,000 members, all of whom reside or work in Connecticut, and many of whom are registered to vote. Many NAACP members in Connecticut who are registered voters reside in state legislative districts that are overcrowded as a result of prison gerrymandering, including members that reside in House Districts 88, 91, 94, 95, 96, and 97, among others.

22.     NAACP-CT seeks to support the mission of the NAACP by organizing its members in Connecticut to advocate for political, educational, social and economic equality of rights. NAACP-CT devoted its April 2018 conference to criminal justice reform with the opportunity for attendees to meet candidates for Governor of Connecticut.

23.     The members of NAACP-CT elect the Executive Committee of the NAACP-CT, and are eligible to serve on the Executive Committee if duly elected. The members of NAACP-CT elect voting delegates to represent NAACP-CT and the NAACP national convention.

24.     In addition, the NAACP-CT has had to divert organizational resources to address unlawful prison gerrymandering in Connecticut.

25.     NAACP-CT brings this action in its representative capacity on behalf of its members who are adversely affected by the unequal population of the legislative districts created

by the 2011 Redistricting Plan, and in its organizational capacity as well. NAACP-CT has members that reside in House Districts 88, 91, 94, 95, 96, and 97, among others.

26.     Plaintiff Justin Farmer is a 23 year-old Jamaican-American resident of Hamden, Connecticut and a duly qualified elector eligible to vote in local, state, and federal elections. He has lived in Connecticut his entire life and currently resides at 231 Butler Street, Hamden, Connecticut. Mr. Farmer is a registered voter in Connecticut State House District 94 and regularly votes in state and local elections. Mr. Farmer is a student at Southern Connecticut State University in the Political Science Department, where he hopes to earn his B.A. in 2020. In 2017, he was elected to the Hamden Legislative Council, the town legislature, representing the Fifth District, which includes some of the poorest and wealthiest residents of Hamden. Mr. Farmer wears headphones to manage his Tourette's Syndrome, a movement disorder, which has contributed to law enforcement stopping Mr. Farmer more than thirty times on the street. Mr. Farmer has close family members who have been incarcerated. He is a member of the NAACP and NAACP-CT.

27.     Plaintiff Germano Kimbro is a 58 year-old African-American resident of New Haven, Connecticut and a duly qualified elector eligible to vote in local, state, and federal elections. He has lived in Connecticut his entire life and currently resides at 126 Spring Street, New Haven, Connecticut. Mr. Kimbro is a registered voter in Connecticut State House District 95 and regularly votes in state and local elections. He also regularly participates in voter registration drives and volunteers for local, state and federal campaigns. Mr. Kimbro, a graduate of Springfield College, has worked for decades to reform the criminal justice system. As a young man, Mr. Kimbro was incarcerated, at which point he turned to education and service. Once he returned to the community, Mr. Kimbro dedicated himself to assisting people in overcoming the

stigma of criminal convictions and poverty. He has worked in a variety of human services positions and helped to launch the Pardon Me Program, through which he educated hundreds of Connecticut residents so that they could apply for pardons. He has worked for numerous state legislative reforms, including to establish the Connecticut Fatherhood Initiative (P.A. 99-193), to "Ban the Box" (P.A. No. 16-83), and to limit solitary confinement (P.A. 17-239). He is a member of Just Leadership USA and a lifelong member of the NAACP and NAACP-CT.

28.     Plaintiff Conley Monk, Jr. is a 69 year-old African-American resident of Hamden, Connecticut and a duly qualified elector eligible to vote in local, state, and federal elections. He has lived in Connecticut for nearly his whole life, and currently resides at 2360 Shepard Ave in Hamden, Connecticut. Mr. Monk is a registered voter in Connecticut State House District 88, and regularly votes in state and local elections. Mr. Monk is also a Marine Corps combat veteran of the Vietnam War, the Director of the National Veteran's Council for Legal Redress, a Connecticut-based Veterans service organization, and participates in community development through his family organization, the Monk Council. Mr. Monk is a member of the NAACP and NAACP-CT.

29.     Plaintiff Garry Monk is a 59 year-old African-American resident of New Haven, Connecticut and a duly qualified elector eligible to vote in local, state, and federal elections. He has resided in Connecticut for more than twenty years, and currently lives at 140 Fountain Terrace in New Haven, Connecticut. Mr. Monk is a registered voter in Connecticut State House District 92, and regularly votes in state and local elections. Mr. Monk is a veteran of the U.S. Air Force and serves as the Executive Director of the National Veteran's Council for Legal Redress, participates in community development through the Monk Council, and is an active member of the Thomas Chapel Church of Christ. Mr. Monk is a member of the NAACP and NAACP-CT.

30.     Plaintiffs Conley and Garry Monk are brothers, and have a nephew who was incarcerated in Enfield Correctional Institution. This nephew was supported by the Monk family while incarcerated, and has recently returned to live in New Haven.

31.     Plaintiff Dione Zackery is a 49 year-old African-American resident of New Haven, Connecticut and a duly qualified elector eligible to vote in local, state, and federal elections. She currently resides at 1435 Quinnipiac Ave. Unit 5, New Haven, Connecticut. Ms. Zackery is a registered voter in Connecticut State House District 97 and regularly votes in state and local elections. Ms. Zackery has been a registered voter since age eighteen, when she first registered to vote in Connecticut. She has multiple family members who have been incarcerated in Connecticut prisons, including several cousins who are currently incarcerated. Ms. Zackery's former partner, the father of her children, is formerly incarcerated. One cousin resided with Ms. Zackery before entering prison. He has now been released and is living on his own nearby. During the period of his incarceration, they wrote to each other and spoke on the phone. Ms. Zackery is a member of the NAACP and NAACP-CT.

32.     Defendant Denise Merrill is a resident of Connecticut and is Connecticut's Secretary of State and Chair of the State Elections Board. She is sued in her official capacity. Secretary of State Merrill is the Constitutional officer of the State charged with publishing the legislative district map and conducting elections in Connecticut in a manner consistent with federal constitutional and statutory requirements.

33.     Defendant Dannel P. Malloy is the Governor of Connecticut. He is sued in his official capacity. Governor Malloy is the Constitutional officer of the State charged with appointing Reapportionment Commissions for the purposes of adopting state assembly and senatorial districting plans.

## FACTUAL ALLEGATIONS

A.      *Mass Incarceration and Prison Construction in Connecticut*

34.     In recent decades, the United States' incarceration rate has surged. Since the 1970s, the United States penal population exploded from approximately 300,000 to more than 2 million. The United States imprisons more people, per capita, than any other nation.

35.     Persons with a felony conviction are more likely to become homeless and lose custody of their children, and less likely to find employment and complete their educations.

36.     African Americans and Latinos experience an especially high rate of imprisonment and tend to live in racially and economically segregated neighborhoods. As a result, the social and political effects of imprisonment are focused in their communities.

37.     Connecticut is no exception.  The state has the fifth-highest rate of incarceration of African American men in the country. Whites outnumber African Americans and Latinos by an almost 3-to-1 ratio in the state's general population, but there are twice as many African Americans and Latinos as whites in Connecticut prisons.

38.     African Americans in Connecticut are almost ten times more likely to be incarcerated than whites, and Latinos are almost four times more likely to be incarcerated than whites.

39.     The problem of prison gerrymandering is particularly severe in Connecticut because of the State's concentration of prisoners at facilities that are significant distances from their home communities.

40.     Before 1980, Connecticut maintained correctional facilities at eight sites dispersed across the state, as illustrated in Figure 1.

Prisons in Connecticut Before 1980



41.     The prison population in Connecticut increased from 3,828 in 1980 to 18,416 in 2010. This increase coincided with a surge of prison construction and expansion projects in the 1980s and 1990s.

42.     Of the twenty-one prison expansion projects Connecticut undertook between 1842 and 2003, fifteen – nearly all – were completed between 1988 and 1998. During this decade, the State expanded seven facilities: Manson Youth Institution, York Correctional Institution, Brooklyn Correctional Institution, Hartford Correctional Center, New Haven Correctional Center, Cheshire Correctional Institution, and MacDougall-Walker Correctional Institution.

43.     As Connecticut incarcerated more of its residents over the past three decades, the State concentrated prisons in a few discrete geographic areas whose economies became dependent on these correctional facilities.

44.    Out of ten prison expansion projects finished between 1990 and 1997, the State completed half within three adjacent cities—Enfield, Somers and Suffield—along the northern border of central Connecticut, a region that already had three existing prisons.

45.    Connecticut's correctional facilities are now even more concentrated in two areas: the Enfield-Suffield-Somers region along the northern border and Cheshire, in the central part of the state. The distribution of correctional facilities as of the 2010 census is set forth in Figure 2.

## Prisons in Connecticut in 2010



46.    The overall prison population has declined during the tenure of Defendant Governor Malloy, but the residual population in the Department of Correction's fourteen currently operating prisons remains concentrated in lightly-populated or rural areas.

47.    A large and disproportionate number of Connecticut prisoners are African American or Latino persons who maintained a permanent address, pre-incarceration, in one of

the State's three urban centers of Hartford, Bridgeport, and New Haven and their immediate suburbs.

48.     The pre-incarceration addresses of Connecticut's prisoners are illustrated in Figure 3.  The sizes of the colored circles correspond to the percentage of Connecticut's prisoners who resided in that particular geographic area immediately prior to incarceration.

### Where Incarcerated Residents Lived Prior to Incarceration



49.     Connecticut relocates nearly all of its prisoners to a correctional facility in a rural, predominantly white, lightly-populated area, especially in the Enfield-Somers-Suffield area along the northern border. The State maintains a second concentration of prisoners in the Cheshire area.

50.     The siting of prisons in locations far from the urban centers where most prisoners maintained a permanent domicile, combined with a lack of public transportation, creates further hardship for incarcerated people and their families.

51.     The  location of prisoners by population as of the 2010 census is illustrated in Figure 4.  The sizes of the colored shapes correspond to the percentage of incarcerated people who are housed in a prison located in that particular geographic area.

## Where Prisoners are Incarcerated



***Prison and District Populations***

52.     Hartford Correctional Institution (Hartford) is located in House District 5.

53.     York Correctional Institution (East Lyme) is located in House District 37.

54.     Corrigan-Radgowski Correctional Center (Montville) is located in House District 42.

55.     Osborn Correctional Institution (Osborn) and Northern Correctional Institution (Northern) are located in House District 52.

56.     Robinson Correctional Institution (Robinson) and Willard-Cybulski Correctional Institution (Willard-Cybulski) are located in House District 59. Enfield Correctional Institution

(Enfield), which was operational during the 2010 Census and 2011 redistricting plan, and which continued operating until January 23, 2018, is also located in House District 59.

57.     MacDougall Walker Correctional Institution (MacDougall-Walker) is located in House District 61.

58.     Manson Youth Correctional Institution (Manson) and Cheshire Correctional Institution (Cheshire) are located in House District 103.

59.     Garner Correctional Institution (Newtown) is located in House District 106.

60.     MacDougall-Walker, Robinson, Enfield, Willard-Cybulski, Osborn, and Northern are all located in Senate District 7.

**B.**     ***State Legislative Redistricting in Connecticut***

61.     The Connecticut legislature, exercising authority granted by Article III of the state Constitution, appointed a Reapportionment Committee following the 2010 Census.

62.     The Reapportionment Committee failed to meet its September 15, 2011 deadline to submit a redistricting plan. Pursuant to Article III of the Connecticut Constitution, Governor Malloy appointed a Reapportionment Commission on October 5, 2011.

63.     On November 30, 2011, the Reapportionment Commission unanimously adopted a state legislative redistricting plan and submitted it to Defendant Merrill.

64.     The state legislative redistricting plan became effective soon thereafter upon publication by Defendant Merrill. See Conn. Const., Art. 3 § 6(c) ("Upon receiving such plan [from the Reapportionment Commission] the secretary [of state] shall publish the same forthwith, and, upon publication, such plan of districting shall have the full force of law.").

65.     According to the Connecticut Department of Corrections, and as counted in the 2010 Census, each prison described in paragraphs 52 through 60 held the following number of incarcerated people in March 2010:

| Facility | Prisoners |
|---|---|
| Hartford | 1,095 |
| York | 2,014 |
| Corrigan-Radgowski | 1,511 |
| Osborn | 1,980 |
| Northern | 356 |
| Robinson | 1,486 |
| Enfield | 724 |
| Willard-Cybulski | 1,164 |
| MacDougall-Walker | 2,137 |
| Manson | 608 |
| Cheshire | 1,494 |
| Garner | 608 |

66.     The Connecticut Legislature commissioned a report from the Office of Legislative Research in 2010 that indicated the majority of people incarcerated in these prisons were not residents of the districts in which they were incarcerated.

67.     No Connecticut state law requires counting prisoners where they are incarcerated. Counting prisoners where they are incarcerated is a *choice* made by the Reapportionment Commission appointed by Governor Malloy and reflected in the plan published by Defendant Merrill.

68.    The Connecticut Legislature has considered legislation mandating that prisoners be counted at their pre-incarceration addresses for reapportionment purposes in its 2011, 2013, 2015, and 2016 legislative sessions. Lawmakers failed to enact legislation in each instance, leaving the 2011 Redistricting Plan unchanged.

69.    A significant number of the people incarcerated in Connecticut's fourteen operational prison facilities are ineligible to vote because they have been convicted of a felony. CONN. GEN. STAT. § 9-46 ("persons with a felony conviction [are] not eligible to vote in Connecticut elections").

70.    Connecticut statutes treat the few incarcerated people who *are* eligible to vote as residents of their pre-incarceration domiciles and prohibit these voters from claiming residence for voting purposes in the district in which they are incarcerated. CONN. GEN. STAT. §§ 9-14, 9-14a.

71.    When combined with the practice of prison gerrymandering, the geographic concentration of prison facilities results in the dilution of the votes of residents in urban voting districts that are overpopulated as compared to districts that contain prison facilities.

72.    Because they reside in such overpopulated districts, Plaintiffs Justin Farmer, Germano Kimbro, Conley Monk, Jr., Garry Monk, and Dione Zackery (hereafter "individual Plaintiffs") and members of Plaintiffs NAACP and NAACP- CT (hereafter collectively "the NAACP") have substantially less voting power than residents of at least five State House Districts, and as many as nine House Districts. These include Districts 5, 37, 42, 52, 59, 61, 103, 106, and 108, and Senate District 7 (hereinafter "gerrymandered districts").

73.     Data locating prisoners at their exact pre-incarceration addresses is not publicly available. Home district of origin may be approximated, however, using public records detailing the home towns and cities of prisoners at the time of their admission.

74.     When district population size is calculated using these prisoner reallocation estimates, nine State House districts (Districts 5, 37, 42, 52, 59, 61, 103, 106, and 108) have more than ten percent fewer people than the most populated House district (District 97).

75.     Even when prisoners are removed from the apportionment base rather than counted in their approximate pre-incarceration districts, five House districts (Districts 5, 52, 59, 61, and 103) are more than ten percent smaller than the largest House District (District 88).

76.     For every 85 residents in District 59 (which encompasses Robinson, Enfield, and Willard-Cybulski Correctional Institutes), there are over 100 residents in District 97 (located in New Haven). The vote of a District 97 resident thus counts for less than 85% of the vote of a District 59 resident. Similar imbalances occur in the other gerrymandered districts.

77.     Because their individual votes count for less, individual Plaintiffs, NAACP members, and their fellow residents must invest greater energy to elect representatives of their choice. Plaintiffs in District 97 have over 15% more doors to knock on, voters to call, and mailings to send if they wish to have an equal influence over the political process as residents of District 59. Because of this increased need for resources, their campaign donations go less far.

78.     Because their district is overpopulated in this manner, the influence of individual Plaintiffs' and NAACP members over their representatives is also diluted. For example, District 97 Representative Al Paolillo has 3,751 more constituents than District 59 Representative Carol Hall. Thus, to serve his full body of constituents, Rep. Paolillo must fully listen and respond to 15% more people despite working with the same level of funding, staff, and hours in the day.

79.     The Connecticut State House of Representatives has 151 members, and the Connecticut State Senate has 36 members, each of whom is elected by an individual district.

80.     The 151 individual House districts each elect one member to the State House of Representatives, and the 36 individual Senate districts each elect one member to the State Senate.

81.     The "ideal" district size is defined by the total state population divided by the number of districts.

82.     According to Connecticut State's published data after the 2011 redistricting, the ideal House district size is 23,670 residents.

83.     The gerrymandered districts, however, have substantially fewer residents than the ideal population, and are thus more than ten percent smaller than the largest state district, District 97.

84.     For instance, as of November 2011, District 59 contained only 21,001 residents when prisoners are counted in their home districts. When compared with District 97, which would have a population of approximately 24,752 residents when prisoners are counted in their home districts, the actual number of constituents in District 59 was 15.84% smaller.

85.     The following table sets forth the populations and deviation from District 97, the largest district, of other House Districts, including and excluding prisoners:

| District | Population (prisoners counted where incarcerated) | Population (prisoners counted in approximate home districts) | Deviation from the largest district |
|---|---|---|---|
| 5 | 23,000 | 22,139 | 11.04% |
| 37 | 23,310 | 21,333 | 14.44% |
| 42 | 23,663 | 22,218 | 10.70% |
| 52 | 23,531 | 21,250 | 14.79% |

| | | | |
|---|---|---|---|
| **59** | 24,314 | 21,001 | 15.84% |
| **61** | 23,448 | 21,330 | 14.45% |
| **103** | 23,005 | 21,543 | 13.56% |
| **106** | 22,971 | 22,382 | 10.01% |
| **108** | 23,531 | 22,234 | 10.64% |

86.     The ideal Senate district size is 99,280 residents. Senate District 7 contained 102,622 residents as of 2011.

87.     Senate District 7 contained 94,692 residents when incarcerated persons are counted in their home districts. There are 9.53% fewer residents in Senate District 7 than in District 26, the largest Senate district.

88.     The most recent census data, based on the 2011-2015 American Community Survey (ACS) five-year estimates, demonstrates that the above discrepancies have worsened based on population changes since district lines were drawn.

89.     As a result of the current districting plan, residents of the prison gerrymandered districts possess artificially inflated voting and representational power compared to those in other districts, whereas the people incarcerated in the gerrymandered districts have effectively no representation.

90.     For instance, upon information and belief, State Senator John Kissel (S-7) has not visited incarcerated people in any of the five prisons located in his district over his past two terms.

91.     The effect is that Connecticut's 2011 Redistricting Plan reflects neither electoral equality nor representational equality.

92.     It would have been possible for the Reapportionment Committee or Reapportionment Commission to adjust district boundaries so as to prevent creating nine malapportioned House districts containing prisons, thus safeguarding the principle of one person, one vote, but they did not do so. This remedy would require minor alterations to approximately 30 additional contiguous districts, and can be accomplished without introducing incumbent conflicts.

93.     Prison gerrymandering also deprives the state of Connecticut of at least one minority opportunity district. The same districting plan which would restore "one person one vote" also has the effect of raising the Citizen Voting Age Population in House District 14 from 20.2% under the current plan to nearly 45%, thus enhancing the potential for the Connecticut legislature to more accurately reflect the choices of Connecticut's voting population.

94.     Plaintiffs are suffering irreparable harm as a result of Defendants' actions, and that harm will continue unless defendants' current practice of counting prison populations for the purpose of apportionment is declared unlawful and enjoined.

95.     Plaintiffs have no adequate remedy at law other than this action for declaratory and injunctive relief.

## FIRST CAUSE OF ACTION

### (Violation of 42 U.S.C. § 1983 and Equal Protection)

96.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

97.     Section 1 of the Fourteenth Amendment to the United States Constitution provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

98.    The "one person, one vote" principle of the Equal Protection Clause of the Fourteenth Amendment mandates that each person's vote shall be equal to that of his or her fellow citizens.

99.    Defendants' reliance on the incarcerated population in determining the geographic boundaries of House Districts 5, 37, 42, 52, 59, 61, 103, 106, and 108, and Senate District 7 under the 2011 Redistricting Plan inflates the voting strength and political influence of the residents in these districts and dilutes the voting strength and political influence of Plaintiffs and other persons residing outside of these districts, in violation of the Equal Protection requirements of Section 1 of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to:

1)    Exercise jurisdiction over Plaintiffs' claims;

2)    Declare that the use of prison gerrymandering in the 2011 Redistricting Plan adopted by Connecticut violates the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983;

3)    Enjoin Defendants and their agents, employees, and representatives from conducting elections for the Connecticut House of Representatives and Senate under the 2011 Redistricting Plan in the 2020 electoral cycle;

4)    In the event Defendants fail or are unable to implement a redistricting plan that comports with the Constitution and laws of the United States, enforce a court-ordered redistricting plan;

21

5)      Award Plaintiffs the expenses, costs, fees, and other disbursements associated

with the filing and maintenance of this action, including reasonable attorneys' fees pursuant to

42 U.S.C. § 1988;

6)      Exercise continuing jurisdiction over this action during the enforcement of its

judgment; and

7)      Award any other and further relief this Court deems proper and just.

Dated this 28th day of June 2018.


Respectfully submitted,

/s/ Michael J. Wishnie

| | |
|---|---|
| | Bradford M. Berry** |
| Ashley Hall, Law Student Intern* | National Association for the Advancement |
| Keturah James, Law Student Intern* | of Colored People, Inc. |
| Richard Medina, Law Graduate | Office of General Counsel |
| Alden Pinkham, Law Student Intern* | 4805 Mount Hope Drive |
| John Super, Law Student Intern* | Baltimore, MD 21215 |
| Hope Metcalf (ct27184) | (410) 580-5797 |
| Michael J. Wishnie (ct27221) | bberry@naacpnet.org |
| Rule of Law Clinic | |
| Yale Law School | |
| 127 Wall Street | |
| New Haven, CT 06511 | |
| (203) 436-4780 | |
| michael.wishnie@ylsclinics.org | |

*Counsel for Plaintiffs*


* Motion for law student appearance forthcoming
** Motion for admission *pro hac vice* forthcoming