**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NAACP, ET AL., | : | No. 3:18-cv-01094-WWE |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | |
| | : | |
| DENISE MERRILL, ET AL., | : | |
| *Defendants.* | : | SEPTEMBER 6, 2018 |

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS**

The Connecticut Reapportionment Commission relied on facially neutral population numbers from the United States census to draw the current legislative map. Connecticut is not alone in taking that approach. To the contrary, ***every*** state relies on census numbers for redistricting purposes, and only four states adjust the numbers to count prisoners differently than the census. The Supreme Court repeatedly has approved Connecticut's approach, most recently in *Evenwel v. Abbott.* The use of unmodified census data is therefore the "norm" and "constitutional default," and states may rely on it to draw their legislative maps. *Davidson v. City of Cranston*, 837 F.3d 135, 144 (1st Cir. 2016).

When states do rely on unmodified census population numbers, their map will violate the principle of "one person, one vote" only if the deviation between the population of the largest and smallest districts exceeds 10%. If the deviations do not exceed that threshold, the map itself does not establish a prima facie case of discrimination, and the challenger must independently demonstrate that the legislature intended to discriminate when it drew the challenged districts.

None of that has been alleged here. To the contrary, Plaintiffs concede that Connecticut's map falls safely within the 10% threshold based on the facially neutral census numbers that the legislature actually used. And they make no claim that the legislature purposefully relied on those numbers with the intent to discriminate against Plaintiffs or any other group.

Despite the historic and near-universal nature of the practice that Connecticut has followed, and the Supreme Court's consistent approval of it, Plaintiffs remarkably claim that the constitution now suddenly forbids states from using unmodified census data to measure population because the census counts prisoners as residents of the town where they are incarcerated. Plaintiffs further contend that *if* prisoners are counted in their "district of origin" instead, only then would Connecticut's map exceed the 10% threshold. In other words, Plaintiffs seek to manufacture a violation of one person, one vote that does not currently exist by dictating a population counting method that the legislature did not use and that the Supreme Court has made clear is not constitutionally required.

The First Circuit recently rejected virtually identical claims in *Cranston*, in which that Court correctly held that the decision about whether and how to count prisoners in the population base is an inherently political judgment that involves fundamental "choices about the nature of representation" with which courts have "no constitutionally founded reason to interfere." *Davidson*, 837 F.3d at 143, quoting *Burns v. Richardson*, 384 U.S. 73, 92 (1966). That decision was correct, and was compelled by decades of Supreme Court precedents.

The only difference between this case and *Cranston* is Plaintiffs' claim that the purported impacts that were insufficient to state a claim in *Cranston* somehow should be declared unconstitutional in this case because they allegedly fall disproportionately on minority residents in urban districts.  Even if that claim were accurate—which it is not—it creates a distinction without a difference:  There simply is no such thing as a disparate impact claim under the Fourteenth Amendment.  Rather, the Supreme Court repeatedly has made clear that, when the 10% threshold is met based on a facially neutral population baseline, to state an Equal Protection violation the challenger must independently demonstrate both a disparate impact ***and*** a discriminatory intent, the latter of which Plaintiffs have not even attempted to allege.  *Cranston* is therefore directly on point in all material respects, and this Court should follow it.

Ultimately, Plaintiffs' claim simply has no basis in precedent or practice.  Connecticut's map falls within the 10% safe harbor based on the census numbers that the legislature actually used, and the map itself therefore does not establish a prima facie violation of one person, one vote.  Further, Plaintiffs do not allege or claim that the legislature purposefully relied on those facially neutral population numbers with the intent to discriminate against minority residents in urban districts.  Plaintiffs have therefore failed to allege an ongoing violation of federal law, and the *Ex Parte Young* exception to the Eleventh Amendment does not apply.  And for that same reason, the Complaint also fails to state a claim upon which relief can be granted.

## BACKGROUND

The Connecticut constitution grants the power to draw legislative maps to elected officials in the General Assembly.  Conn. Const. art. III, § 6.   A bipartisan Reapportionment Commission carried out that duty and adopted a redistricting plan on November 30, 2011.[1]  Compl., ¶¶ 61-64.  As has historically been the case, in calculating the population for each district the Commission relied on population numbers from the United States census, which counts prisoners as residents of the town where they are incarcerated.  *See e.g., id.*, ¶¶ 2, 8.  That was a policy choice made by a bipartisan group of elected officials, and it is consistent with the practice that "all 50 States and countless local jurisdictions have followed for decades, even centuries."  *Evenwel*, 136 S. Ct. at 1123, 1132.  It also is the same policy choice that the Supreme Court repeatedly has approved.  *Id.* at 1123-24 and n.3, 1132.

The Supreme Court has long required that legislative maps drawn on the basis of census data must comply with the principle of one person, one vote, which simply requires that each district must contain approximately the same "aggregate number of inhabitants."  *Id.* at 1127-29.  Because perfect parity is not possible, however, the Supreme Court has established a safe harbor under which a map is deemed presumptively permissible as long as the deviation between the population of the largest and smallest districts does not exceed 10%.  *Id.* at 1124.[2]

---

[1]     Public information related to the redistricting process is available at https://www.cga.ct.gov/red2011/default.asp.

[2]     States are held to a stricter standard when it comes to Congressional redistricting.  *See Mahan v. Howell*, 410 U.S. 315, 321-22 (1973).

Here, Plaintiffs do not dispute that Connecticut's map falls within the 10% safe harbor when measured by the census numbers that the legislature actually used. Plaintiffs nevertheless claim that the constitution prohibits Connecticut from relying on those numbers because the census counts prisoners as residents of the town where they are incarcerated. Plaintiffs instead believe that the constitution requires states to adjust the census numbers either to count prisoners as residents of their district of origin, or to remove them from the population base altogether. Plaintiffs allege that *if* prisoners had been counted in the manner that Plaintiffs prefer, only then would some of the districts exceed the 10% threshold. *See* Compl., ¶¶ 74, 75, 84 (alleging that deviations in population exceed 10% only when "using [Plaintiffs'] prisoner reallocation estimates," "when prisoners are removed from the apportionment," or when prisoners are "counted in their home districts").

Plaintiffs appear to identify three reasons why they believe that their preferred population counting method is constitutionally required.

First, Plaintiffs point out that some prisoners cannot vote under Connecticut law. *Id.*, ¶ 69, citing Conn. Gen. Stat. § 9-46. Thus, even if the total population across districts is the same, Plaintiffs suggest that there are fewer voting residents in prison districts. Because an individual's vote carries more weight when there are fewer voters, Plaintiffs allege that residents in prison districts in effect have more voting power and ability to influence the electoral process than residents in non-prison districts. *Id.*, ¶¶ 69, 77-78. The result, according to Plaintiffs, is to deprive residents in non-prison districts of their right to "electoral equality." *Id.*, ¶ 91.

5

Second, Plaintiffs allege that prisoners do not have any "meaningful connection" to the town where they are incarcerated and do not visit establishments in those districts. *Id.*, ¶ 4. They further allege that prisoners have "no contact" with legislators in prison districts, and that legislators in those districts "do not visit prisoners" or represent them in practice. *Id.*, ¶¶ 5, 89-90. The result, according to Plaintiffs, is that legislators in prison districts have what Plaintiffs characterize as fewer "actual constituents" than legislators in non-prison districts, thereby violating Plaintiffs' right to "representational equality." *Id.*, ¶¶ 8, 78, 91.

Finally, Plaintiffs allege that various factors unrelated to redistricting— including mass incarceration and the resulting construction of new prisons—have created a situation in which the impacts discussed above fall disproportionately on minority residents in urban districts. *See, e.g., id.*, ¶¶ 34-51, 71. However, Plaintiffs ***do not*** allege that the legislature intended to discriminate against those individuals, and instead allege only an unintended disparate impact on them.

## ARGUMENT

At the outset, it is important to make clear which claims are at issue in this case, and which are not. Specifically, this case is ***not*** about whether Connecticut's map complies with one person, one vote when measured by the census data that the legislature actually used, as there is no dispute that it does. Nor is this case about whether Connecticut's map would comply with one person, one vote if prisoners were counted as residents of their district of origin, since that is not how the legislature chose to measure population and is not how the districts were drawn.

6

Rather, the ***only*** issue at this time is whether the Equal Protection Clause categorically prohibits Connecticut from following the historic, near-universal, and judicially approved practice of using unmodified census data to measure population, and whether the constitution instead mandates that states ***must*** count prisoners as residents of their district of origin.  When the issues are properly framed in this manner, Plaintiffs have not alleged an ongoing violation of federal law, and therefore have not satisfied the *Ex Parte Young* exception to the Eleventh Amendment or stated a claim for relief.  That is true for three reasons.

First, Connecticut's map satisfies one person, one vote because it achieves representational equality when measured by the census population numbers that the legislature actually used.  To the extent that Plaintiffs ask this Court to second guess the legislature's policy choice to use that population base, and to dictate Plaintiffs' own preferred population formula instead, the Court cannot do so.  To the contrary, absent a showing of intentional discrimination—which Plaintiffs do not even attempt to make—the decision about whether and how to include prisoners in the population base is an inherently political judgment that involves "fundamental choices about the nature of representation" with which courts have "no constitutionally founded reason to interfere."  *Gaffney v. Cummings*, 412 U.S. 735, 749-51, 754 (1973); *Burns*, 384 U.S. at 92.  A different conclusion would conflict with decades of Supreme Court precedents, and also would improperly upset the "well-functioning," "uniform" and "settled practice" that the states have adopted to measure population for redistricting purposes.  *Evenwel*, 136 S. Ct. at 1123, 1132.

Second, to the extent that Plaintiffs claim that Connecticut's map does not achieve electoral equality because residents in prison districts have more voting power, that claim fails because *Evenwel* makes clear that there simply is no such thing as a "voter-equality mandate in the Equal Protection Clause." *Id.* at 1126.

Third, to the extent that Plaintiffs claim this court should override the legislature's otherwise legitimate policy choice because factors unrelated to redistricting allegedly have given rise to unintended consequences that disproportionately affect minority residents in urban districts, the Court once again cannot do so. That is a quintessential disparate impact claim that simply has no basis in the Equal Protection Clause of the Fourteenth Amendment.

## THIS CASE IS BARRED BY THE ELEVENTH AMENDMENT AND FOR FAILURE TO STATE A CLAIM BECAUSE PLAINTIFFS HAVE NOT ALLEGED AN ONGOING VIOLATION OF FEDERAL LAW

The Eleventh Amendment precludes suit against the State unless the State consents to suit in federal court, Congress abrogates the State's immunity, or the case falls within the *Ex Parte Young* doctrine. *Green v. Mansour*, 474 U.S. 64, 68 (1985). Only the *Ex Parte Young* exception is implicated here. To invoke that exception, Plaintiffs must demonstrate, among other things, that they are being subjected to an ongoing violation of federal law. *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007). Plaintiffs have made no such showing, and *Ex Parte Young* therefore does not apply. And for that same reason, the Complaint also fails to state a claim for relief.

## I.   THE ONE PERSON, ONE VOTE LEGAL FRAMEWORK

The Supreme Court has long held that "the fundamental principle of representative government in this country is one of equal representation for equal numbers of people." *Reynolds v. Sims*, 377 U.S. 533, 560-61 (1964). That principle, known as "one person, one vote," requires that state legislative districts "must be apportioned on a population basis" and must have a "substantial equality of population among the various districts . . . ." *Id.* at 559, 568. To satisfy that constitutional test, a state must "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Id.* at 577.

Although that general requirement is clear, the Supreme Court repeatedly has stressed that legislative redistricting is solely "the duty and responsibility" of the state legislatures, and that it involves "a complex interplay of forces" that are inherently political in nature and that are "exclusively for the legislature to make." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Burns*, 384 U.S. at 89. Federal-court review of redistricting legislation therefore "represents a serious intrusion on the most vital of local functions," and federal courts "must be sensitive" to the states' exercise of their "discretion" and "political judgment" when balancing competing interests in this area. *Perez*, 138 S. Ct. at 2324; *Miller v. Johnson*, 515 U.S. 900, 915 (1995).

That is especially true with regard to the legislature's choice about whether and how to include prisoners and other transient or non-voting groups in the population base. *Burns*, 384 U.S. at 92. Those questions involve "fundamental" and inherently political choices about the "nature of representation" that the Supreme Court repeatedly has made clear courts have "no constitutionally founded reason to interfere" with. *Id.*; *Gaffney*, 412 U.S. at 749-51, 754 (quotation marks omitted). Such decisions are instead political questions that properly are left to the "political and legislative process." *Gaffney*, 412 U.S. at 749; *see Evenwel*, 136 S. Ct. at 1126 n.6, citing *Chen v. Houston*, 206 F.3d 502, 528 (5th Cir. 2000) and *Daly v. Hunt*, 93 F.3d 1212, 1227 (4th Cir. 1996).

Given these principles, the Supreme Court has established a safe harbor under which a redistricting map "presumptively complies with the one-person, one-vote rule" as long as "the maximum population deviation between the largest and smallest district is less than 10%" when measured by a facially neutral population baseline. *Evenwel*, 136 S. Ct. at 1124. When any deviations fall within that threshold, the map itself will not establish a prima facie case of discrimination and the State has no obligation to justify it. *Harris v. Arizona Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1306-07 (2016). The only way that a challenger can proceed in such cases is by independently demonstrating that the map has a disparate impact **and** that the legislature intended for that impact to occur. *See, e.g., Perez*, 138 S. Ct. at 2314, 2324; *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481-82 (1997); *Mobile v. Bolden,* 446 U.S. 55, 66-70 (1980).

A.     *Evenwel v. Abbott*

Most of the cases since *Sims* have focused on what percentage of population deviation is constitutionally permissible, resulting in the 10% safe harbor discussed above.   Less attention has been given to the question of which population base states must (or may) seek to equalize.  The Supreme Court answered that question in *Evenwel*, in which the Court made clear that states constitutionally may seek to equalize total population, and that they may do so by using unmodified numbers from the United States census.

Like Connecticut, in *Evenwel* Texas drew its map "using a total-population baseline," and used unmodified census data to measure the population of each district.   136 S. Ct. at 1125; *see id.* at 1124 and n.3.   As here, the population deviations in Texas' map fell within the 10% safe harbor when measured by census data, but exceeded 40% when measured by the plaintiffs' preferred "voter population" baseline.   *Id.* at 1125.   Echoing Plaintiffs' claim in this case, the *Evenwel* plaintiffs argued that a voter population baseline is constitutionally mandated because a total population baseline dilutes the voting strength of residents in districts with the largest voting populations, in violation the plaintiffs' claimed right to "electoral equality."  *Id.*

A three-judge District Court panel rejected the claim and held that states properly may use "any neutral, nondiscriminatory population baseline" to draw their state and local legislative districts.  *Id.* at 1126.  The Supreme Court affirmed that judgment.

In doing so, the Supreme Court squarely held that there is no such thing as a "voter-equality mandate in the Equal Protection Clause." *Id.* Rather, our constitutional system is based on the principle of "representational equality," which merely requires that each district should have the same number of people, and that the number of people should be measured by "the aggregate number of inhabitants" in each district. *Id.* at 1127-29 (emphasis omitted). The Court therefore held that "it is plainly permissible for jurisdictions to measure equalization by the total population," and that states may do so by relying on unmodified population numbers from the census (as Texas did in that case). *Id.* at 1126-28.

In so holding, the Court emphasized that its conclusion in that regard is both confirmed and compelled by the "well-functioning," "uniform" and "settled practice" that "all 50 States and countless local jurisdictions have followed for decades, even centuries." *Id.* at 1123, 1132. Indeed, the Court noted that ***all*** states currently "use total-population numbers from the census when designing congressional and state-legislative districts," and that in the "overwhelming majority" of cases that previously have come before the Court the states also chose to equalize total population "as measured by the decennial census." *Id.* at 1124.

Importantly, in making that observation the Court specifically acknowledged that a small minority of seven states have chosen to modify the census data in some way, including an even smaller minority of four states that have chosen to count prisoners differently than the census. *Id.* at 1124 and n.3. Despite acknowledging those potential alternatives, however, the Court pointedly refused to disturb the

other states' "unbroken practice" and "widespread and time-tested consensus" of using unmodified census data to measure population for purposes of legislative redistricting. *Id.* at 1132, quoting *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 678 (1970) and *Burson v. Freeman*, 504 U.S. 191, 203-206 (1992).

The only plausible reading of *Evenwel* is that the "voter population" and other potential population adjustments referenced in Footnote 3 **are not** constitutionally required, and that states may rely on unmodified census data to measure population in the absence of a showing that they did so with the deliberate intent to discriminate against a particular group.

### B.  *Davidson v. City of Cranston*

Although *Evenwel* rejected a claim based on a voter population baseline instead of the prisoner "district of origin" population base that Plaintiffs espouse here, that is a distinction without a difference. Indeed, the First Circuit recently confronted a virtually identical prisoner-based claim in *Cranston*, and squarely held that it is foreclosed by "the methodology and logic of . . . *Evenwel*." *Cranston*, 837 F.3d at 137. This Court should reach the same conclusion.

Like Connecticut, in *Cranston* the City divided its six Wards so as to "contain as nearly as possible an equal number of inhabitants as determined by the most recent federal decennial census." *Id.* at 137. As here, the population deviation was less than 10% when measured by census data. However, one of the Wards included 3,433 prisoners housed in the state's only prison, and the deviation would have been 35% had those prisoners been counted in their district of origin instead. *Id.* at 138.

Just as Plaintiffs do here, the *Cranston* plaintiffs argued that the City's inclusion of prisoners in the Ward where they are incarcerated violates one person, one vote because it: (1) "inflates the voting strength and political influence of the residents in [that Ward] and dilutes the voting strength and political influence of Plaintiffs and other persons residing outside of [the Ward];" and (2) deprives residents in other Wards of representational equality because inmates do not have ties to the Ward where they are incarcerated, and do not actually receive representation from the legislator in that Ward.  *Compare id.* at 139-40 *with* Compl., ¶¶ 4-5, 8, 69, 77-78, 89-91.

The First Circuit categorically rejected the claim and held that the inclusion of prisoners in the population of the district where they are incarcerated is "constitutionally permissible" under the "methodology and logic" of *Evenwel*. *Cranston*, 837 F.3d at 141.  In doing so, the First Circuit identified three principles from *Evenwel* and other Supreme Court cases that compel that conclusion.

First, the First Circuit held that *Evenwel* left undisturbed the longstanding rule that, as long as the 10% safe harbor from *Sims* and its progeny is met based on a facially neutral population base that the legislature chose to use, a state simply has no obligation to justify its map or its chosen population base unless the challenger independently demonstrates that the legislature purposefully chose that population base with the intent to discriminate against a particular group.  *Id.* at 142-43, citing *see Brown v. Thomson*, 462 U.S. 835, 842 (1983), *Gaffney*, 412 U.S. at 745, and *Burns*, 384 U.S. at 88.

14

Second, and relatedly, the First Circuit held that *Evenwel* reinforced the well-established principle that "courts should give wide latitude to political decisions related to apportionment" that are not motivated by an intent to discriminate. *Id.* at 143. The Court specifically emphasized that such political judgments encompass decisions about whether and how to include prisoners and other groups of transient or non-voting individuals in the population base. *Id.*, citing *Burns*, 384 U.S. at 92. "[S]uch decisions, absent any showing of discrimination, 'involve[ ] choices about the nature of representation with which we have been shown no constitutionally founded reason to interfere.'" *Id.*, quoting *Burns*, 384 U.S. at 92.

Third, by approving a map drawn on the basis of unaltered census data, the First Circuit held that *Evenwel* necessarily "approved the status quo of using total population from the Census for apportionment," without any adjustments for prisoners. *Id.* As further support for that conclusion, the Court emphasized the Supreme Court's observations in *Evenwel* that "in the overwhelming majority of cases, jurisdictions have equalized total population, as measured by the decennial census," and that "[t]oday, all States use total-population numbers from the census when designing congressional and state-legislative districts." *Id.* at 143-44, citing *Evenwel*, 136 S. Ct. at 1124 and n.3.

Ultimately, the First Circuit found it "implausible" that the Supreme Court would have made all of the observations and reaffirmations discussed above, upheld the constitutionality of a map drawn on the basis of unaltered census data, and yet left room for a conclusion that the mere use of such objective and facially neutral

data somehow could violate the Equal Protection Clause without any showing that the map exceeds the 10% threshold or that it was otherwise motivated by a discriminatory intent. *Id.* at 144. Rather, the Court held that the "natural" reading of *Evenwel* is that the use of unmodified census data is the "norm" and "constitutional default." *Id.* And although states arguably may choose to adjust the census numbers to count prisoners differently, the courts cannot require them to do so absent a showing of intentional discrimination. *Id.* A different conclusion would invite a judicial usurpation of the legislature's "paradigmatically political decision" about how to count prisoners and other transient groups in the population base, and would improperly turn one of the rare and infrequently used population adjustments that *Evenwel* briefly referenced in Footnote 3 into a universal and mandatory constitutional requirement. *Id.*

## II. IN THE ABSENCE OF A SHOWING OF INTENTIONAL DISCRIMINATION, CONNECTICUT CONSTITUTIONALLY COULD RELY ON UNMODIFIED CENSUS POPULATION NUMBERS TO MEASURE THE POPULATION OF ITS LEGISLATIVE DISTRICTS

*Evenwel* and *Cranston* foreclose Plaintiffs' claim in this case. Those and other cases make clear that: (1) the use of unmodified census data is the "norm" and "constitutional default," and that states constitutionally may rely on such data to measure the population of their legislative districts; and (2) states simply have no obligation to justify a legislative map that falls within the 10% safe harbor when measured by census numbers unless the challenger independently demonstrates that the legislature purposefully relied on those numbers with the intent to discriminate against a particular group.

Here, there is no dispute that Connecticut's map falls within the 10% threshold when measured by census data.  Further, Plaintiffs do not claim that the legislature intended to discriminate when it followed the longstanding and nationwide practice of relying on facially neutral census numbers to measure population.  In the absence of such a showing, this Court is bound by precedent and practice to respect the legislature's policy choice about how to count prisoners in the population base.  *Evenwel*, 136 S. Ct. at 1123-24 and n.3, 1126-29, 1132; *Gaffney*, 412 U.S. at 749-51; *Burns*, 384 U.S. at 88-89, 92; *Cranston*, 837 F.3d at 1141-44.

To the extent that Plaintiffs argue that *Evenwel* is distinguishable because it did not involve the prisoner-based theory at issue here, that claim lacks merit.

As an initial matter, regardless of whether *Evenwel* is distinguishable on that or any other basis—which it is not—*Cranston* clearly is not distinguishable. Indeed, *Cranston* involved the same prisoner-based theories about how using census data allegedly deprives individuals in non-prison districts of representational and electoral equality.  *Compare Cranston*, 837 F.3d at 139-40 *with* Compl., ¶¶ 4-5, 8, 69, 77-78, 89-91.  In fact, the ***only*** difference here is Plaintiffs' claim that the alleged impacts that were insufficient to state a claim in *Cranston* somehow are unconstitutional in this case because they fall disproportionately on minority residents in urban districts.  *See, e.g.,* Compl., ¶¶ 34-51, 71.  As discussed below, that is a distinction without a difference because there simply is no such thing as a disparate impact claim under the Equal Protection Clause.  *Cranston* is therefore ***directly*** on point in all material respects, and this Court should follow it.

17

Further, regardless of whether *Cranston* and *Evenwel* are factually distinguishable, the First Circuit held that "the methodology and logic" of *Evenwel* and other Supreme Court cases squarely foreclose the type of claim that Plaintiffs present. *Cranston*, 837 F.3d at 137. The First Circuit was correct.

First, as discussed above, the Supreme Court repeatedly has made clear that it simply is not this Court's place—and certainly is not Plaintiffs' place—to decide which individuals should be considered "actual" or "real" constituents of any given legislative district, such that they can or should be included in the population of that district. To the contrary, the choice of population base—and in particular the decision about whether and how to include prisoners and other transient groups in the population base—is a political question that involves "fundamental choices about the nature of representation" with which courts have "no constitutionally founded reason to interfere." *Gaffney*, 412 U.S. at 749-51, 754; *Burns*, 384 U.S. at 92; *Cranston*, 837 F.3d at 143; *see Evenwel*, 136 S. Ct. at 1126 n.6, citing *Chen v. Houston*, 206 F.3d 502, 528 (5th Cir. 2000) and *Daly v. Hunt*, 93 F.3d 1212, 1227 (4th Cir. 1996). Such decisions are inherently political in nature, and are "exclusively for the legislature to make." *Burns*, 384 U.S. at 89. As long as the map falls within the 10% threshold when measured by a chosen population baseline that is facially neutral, therefore, the "apportionment base offends no constitutional bar, and compliance with [one person, one vote] is to be measured thereby" unless the challenger independently demonstrates that the legislature chose that population base with the intent to discriminate. *Id.* at 92.

18

Here, Plaintiffs' representational equality claim is based on their own self-serving and erroneous assessment that prisoners cannot be considered "actual" constituents of the district where they are incarcerated because they do not have ties to those districts and do not receive effective representation therein. *See* Compl., ¶¶ 4-5, 8, 78, 89-91. That is the exact kind of political judgment about the "nature of representation" that is exclusively for the legislature to make, and that this Court cannot interfere with absent of a showing of intentional discrimination.

Second, regardless of which alternative population baseline Plaintiffs espouse, and regardless of what other population baselines theoretically may be allowed, the fact of the matter is that *Evenwel* clearly held that the use of unmodified census data is at least one constitutionally permissible way for states to measure population. *Cranston*, 837 F.3d at 143-44. That conclusion is compelled by the fact that not only did *Evenwel* expressly approve a legislative map that relied on unmodified census data, but it also explicitly acknowledged several potential population adjustments in Footnote 3—including prisoner-based alternatives like the one that Plaintiffs espouse—without in any way suggesting that those alternatives are constitutionally required. To the contrary, the Court made clear that those population adjustments ***are not*** constitutionally required insofar as it pointedly refused to disturb the other states' "unbroken practice" and "widespread and time-tested consensus" of using unmodified census data to measure population for redistricting purposes. *Evenwel*, 136 S. Ct. at 1123-24 and n.3, 1132, quoting *Walz*, 397 U.S. at 678 and *Burson*, 504 U.S. at 203-06.

19

As the First Circuit correctly held, it simply is "implausible" to extrapolate anything from *Evenwel* other than that the use of unmodified census data to measure population is the "norm" and "constitutional default," and that states properly may rely on such data in the absence of a showing that their decision to do so was motivated by a desire to discriminate against a particular group. *Cranston*, 837 F.3d at 144.

Third, to the extent that Plaintiffs persist with their claim that they have been deprived of "electoral equality" because residents in prison districts have more voting power and ability to influence the electoral process, *see* Compl., ¶¶ 69, 77-78, 91, that claim is squarely foreclosed by *Evenwel*, which makes clear that there simply is no such thing as an electoral- or "voter-equality mandate in the Equal Protection Clause." 136 S. Ct. at 1126. Rather, our constitutional system is based on the principle of representational equality, which Connecticut's map achieves for the reasons discussed above.

## III. PLAINTIFFS DO NOT ALLEGE OR CLAIM THAT THE LEGISLATURE INTENDED TO INVIDIOUSLY DISCRIMINATE AGAINST THEM

Because Connecticut's legislative map achieves representational equality when measured by the census data that the legislature legitimately used, to state a claim for relief Plaintiffs must independently demonstrate that the legislature purposefully relied on that facially neutral data with the intent to discriminate against minority residents in urban districts. Plaintiffs have not even attempted to make such a claim, and they cannot plausibly do so.

20

As discussed above, when any population deviation between districts exceeds 10%, that constitutes a prima facie case of discrimination that the state must justify. *Brown*, 462 U.S. at 843. When the deviations do not exceed that 10% threshold when measured by the legislature's chosen population baseline, however, the map itself does not "make out a prima facie case of invidious discrimination . . . so as to require justification by the State," and the challenger must present other evidence that independently establishes a case of discrimination. *Harris*, 136 S. Ct. at 1307 (quotation marks omitted).

To that end, the Supreme Court has made clear that challenges to legislative maps that satisfy the 10% threshold based on a facially neutral population baseline are extremely difficult, and that they "will succeed only rarely, in unusual cases." *Id.* That is due at least in part to the fact that such claims cannot be based on a mere showing that the map has a disparate impact on a particular group. Indeed, there is no such thing as a disparate impact claim under the Fourteenth Amendment. *E.g., Reynolds*, 685 F.3d at 201. Rather, the Equal Protection Clause only prohibits "intentional" discrimination, and the "ultimate question" in such cases is "whether a discriminatory intent has been proved." *Perez*, 138 S. Ct. at 2314, 2324. To succeed on their claims, therefore, Plaintiffs must independently demonstrate both a disparate impact ***and*** that the legislature intended for that discriminatory impact to occur. *Bossier Par. Sch. Bd.*, 520 U.S. at 481-82; *Shaw v. Reno*, 509 U.S. 630, 640-41, 649 (1993); *Mobile,* 446 U.S. at 66-70.

21

Plaintiffs have made no such showing, as there is not a single allegation in the Complaint that even arguably touches upon the legislature's motivation for relying on facially neutral population numbers from the United States census. And there certainly is nothing in the Complaint to suggest that the legislature purposefully used that data with the intent to discriminate against and dilute the votes of minority residents in urban districts.

Rather, Plaintiffs allege nothing more than that various factors unrelated to redistricting—including mass incarceration and the resulting construction of more prisons in rural districts—have combined with the long-standing practice of using unmodified census data to create unintended impacts that disproportionately affect minority residents in urban districts. *See, e.g.,* Compl., ¶¶ 34-51, 71. Even if that were true—and Defendants dispute that it is—that is a quintessential disparate impact claim that simply has no basis in the Equal Protection Clause of the Fourteenth Amendment.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiffs have not alleged an ongoing violation of federal law, and their claim is therefore barred by both the Eleventh Amendment and for failure to state a claim upon which relief can be granted. The Court should dismiss the case accordingly.

Respectfully submitted,

DEFENDANTS DENISE MERRIL
AND DANNEL P. MALLOY

GEORGE JEPSEN
ATTORNEY GENERAL

BY: */s/ Michael K. Skold*
    Michael K. Skold (ct28407)
    Maura Murphy Osborne (ct19987)
    Assistant Attorneys General
    Office of the Attorney General
    55 Elm Street
    Hartford, CT 06106
    860-808-5020 (phone)
    860-808-5347 (fax)
    Michael.Skold@ct.gov
    Maura.MurphyOsborne@ct.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2018, a copy of the foregoing was electronically filed. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


*/s/ Michael K. Skold*
Michael K. Skold
Assistant Attorney General