**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NAACP, ET AL., | : | No. 3:18-cv-01094-WWE |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| DENISE MERRILL, ET AL., | : | |
| *Defendants*. | : | OCTOBER 18, 2018 |

**DEFENDANTS' REPLY BRIEF IN FURTHER**
**SUPPORT OF THEIR MOTION TO DISMISS**

Plaintiffs do not dispute that Connecticut's map falls within the 10% threshold when measured by the facially neutral census population numbers that the legislature actually used. Plaintiffs also do not even attempt to argue that the legislature intended to discriminate against minority voters in urban districts, either in its decision to rely on census numbers or in the manner that it drew the legislative map. As the First Circuit correctly held in *Cranston*, therefore, Plaintiffs have failed to establish a prima face case of discrimination under the one person, one vote principle of the Equal Protection Clause.

Plaintiffs seek to avoid that conclusion—and to manufacture an equal protection violation that does not exist—by claiming that Connecticut's map exceeds the 10% threshold only when measured by an entirely different population base that the legislature indisputably ***did not use***. Neither precedent nor practice supports this attempt to supplant the legislature's reasonable exercise of its redistricting authority. To the contrary, the Supreme Court has made clear that the choice of population base—and in particular the decision about how to count prisoners in the population base—is a political judgment that is exclusively for the legislature to make, and that courts cannot interfere with absent a showing of intentional discrimination. Because Plaintiffs have made no such showing, this Court is bound to respect the legislature's choice.

1

### I.  THE COURT CANNOT IMPOSE PLAINTIFFS' CHOSEN POPULATION BASE ABSENT A SHOWING OF DISCRIMINATORY INTENT

The redistricting process involves "a complex interplay of forces" that are inherently political in nature and that are "exclusively for the legislature to make." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Burns v. Richardson*, 384 U.S. 73, 89 (1966).  That is especially true with regard to the decision about how to include prisoners and other transient groups in the population base.  The Supreme Court repeatedly has made clear that those questions in particular involve "fundamental" political choices about the "nature of representation" with which courts have "no constitutionally founded reason to interfere."  *Burns*, 384 U.S. at 92; *Gaffney v. Cummings*, 412 U.S. 735, 749-51, 754 (1973); *see Evenwel v. Abbott*, 136 S. Ct. 1120, 1126 n.6 (2016); *Davidson v. City of Cranston*, 837 F.3d 135, 142-44 (1st Cir. 2016); *Chen v. Houston*, 206 F.3d 502, 528 (5th Cir. 2000); *Daly v. Hunt*, 93 F.3d 1212, 1227 (4th Cir. 1996).  As long as the map falls within the 10% threshold when measured by a chosen population base that is facially neutral, therefore, the "apportionment base offends no constitutional bar, and compliance with [one person, one vote] is to be measured thereby" absent other evidence of discriminatory intent. *Burns*, 384 U.S. at 92; *see also Evenwel*, 136 S. Ct. at 1126 (affirming District Court's conclusion that states may use "any neutral, nondiscriminatory population baseline . . . when drawing state and local legislative districts").

Plaintiffs' claim flies in the face of these precedents, as they inescapably ask the Court to usurp the legislature's authority and impose their own chosen population formula based solely on their own subjective belief that prisoners do not receive effective representation from legislators in their districts.  *See* Pl. Br. at 9, 15-19, 21.  That is precisely the kind of political judgment about the "nature of representation" that this Court cannot interfere with absent a showing of intentional discrimination.  Plaintiffs' arguments to the contrary lack merit.

2

First, Plaintiffs initially suggest—without explanation or citation to legal authority—that the Court should simply disregard the long standing principle discussed above because the cases that established it were decided on a fuller factual record than exists here. Pl. Br. at 11-12. That is wholly irrelevant. The principle established in those cases is a legal principle, not factual, and it applies regardless of the procedural posture in which it is presented. In the absence of allegations of discriminatory intent, therefore, this Court is bound to afford the same deference to the legislature's political choice now as it would be after further factual development.

Second, in an attempt to avoid this fundamental problem, Plaintiffs inexplicably assert that a showing of discriminatory intent is not required because Connecticut's map "exceed[s] the 10% threshold." Pl. Br. at 2, 10-11, 14. But there is no dispute that Connecticut's map ***does not*** exceed the 10% threshold when measured by the population base that the legislature actually used. Rather, it allegedly exceeds that threshold only when measured by an entirely different population base that Plaintiffs ask this Court to unilaterally and retroactively impose more than seven years after the map at issue was designed and approved. *See* Compl., ¶¶ 74, 75, 84; Pl. Br. at 5-6. In making this argument, therefore, Plaintiffs simply disregard the principle discussed above and improperly assume that the Court can dictate whether and how prisoners should be counted in the population base. Having improperly made that unfounded assumption, moreover, Plaintiffs proceed to rely on their own unilaterally dictated population base to create the very same 10% violation upon which their claim purports to be based. And they do all of this without ***any*** allegation that the population base that the legislature actually did use was itself motivated by a discriminatory intent. The argument is circular and the Court should reject it.

Indeed, the flaw in this argument is perfectly illustrated by the equal protection framework in which it arises. Contrary to Plaintiffs' unsupported assertion, the "ultimate question" in *all* one person, one vote cases—just as in every other claim under the Equal Protection Clause—is "whether a discriminatory intent has been proved." *Abbott v. Perez*, 138 S. Ct. 2305, 2314, 2324-25 (2018); *see Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481-82 (1997); *Mobile v. Bolden,* 446 U.S. 55, 66-70 (1980). The 10% rule is nothing more than a burden shifting tool that the Supreme Court has developed to assess whether the discriminatory intent requirement has been satisfied. *Wright v. North Carolina*, 787 F.3d 256, 264 (4th Cir. 2015). Specifically, when the population disparities exceed 10% based on the population base that the legislature used, the courts treat that as a prima facie showing of discriminatory intent that the government must rebut by providing a "satisfactory explanation" that the deviations were "grounded on acceptable state policy." *Brown v. Thomson*, 462 U.S. 835, 843 (1983).

Using the 10% rule as indicia of discriminatory intent makes sense when compliance with the rule is measured by the population base that the legislature actually used. But when compliance is measured by an entirely different population base that the legislature *did not* use—and that Plaintiffs seek to unilaterally impose more than seven years *after* the districts at issue were designed and approved—there simply is no basis for imputing the same presumption of discriminatory intent because any population disparities under the new formula by definition do not reflect what the legislature actually relied upon or considered when it designed the districts at issue. Put differently, the fact that a legislative map could exceed the 10% threshold when measured by a population base that the legislature did not use is not evidence that the population base that the legislature did use (or the map the legislature drew based on that population base) was itself motivated by a discriminatory intent.

Here, Plaintiffs do not dispute that Connecticut's map falls squarely within the 10% threshold when measured by the population base that the legislature actually used, and they do not claim or allege that the legislature chose that population base with the intent to discriminate. In the absence of such allegations, Plaintiffs cannot manufacture their own equal protection violation by unilaterally dictating a different population base and then using that population base to create the very same 10% violation that serves as their only evidence of discriminatory intent.

Third, because *Evenwel* acknowledged that the goal of legislative reapportionment is to facilitate "equitable and effective" representation, Plaintiffs claim that *Evenwel sub silentio* overruled the line of cases discussed above and authorized federal courts to second guess the states' decisions about how to count certain groups in the population base, ***even in the absence of any showing of discriminatory intent***.  See Pl. Br. at 15, 16, 19, 21, citing *Evenwel*, 136 S. Ct. at 1132.  There is nothing in *Evenwel* that even arguably supports that assertion.  To the contrary, the First Circuit expressly rejected that argument in *Cranston*, in which that court squarely held that *Evenwel*: (1) "did not disturb" the established rule that challengers "must show invidious discrimination to make out an apportionment claim under the Equal Protection Clause;" (2) "reinforced the principle established [in *Burns*]" that, absent a showing of intentional discrimination, the decision about whether and how to count prisoners "involve[s] choices about the nature of representation with which [courts have] no constitutionally founded reason to interfere;" and (3) categorically refused to second guess or overrule Texas' decision to rely on unmodified census data.  *Cranston*, 837 F.3d at 142-44.

5

Plaintiffs' selective and misleading reliance on the Supreme Court's reference to "equitable and effective" representation in *Evenwel* does not compel a different conclusion. Reading the entire statement in which the quoted language is contained—most of which Plaintiffs omit from their brief—the Supreme Court merely stated that using total population promotes the goal of "equitable and effective" representation "[b]y ensuring that each representative is subject to requests and suggestions from the same number of constituents." *Evenwel*, 136 S. Ct. at 1132.  Thus, *Evenwel* makes clear there and elsewhere in its opinion that, for purposes of one person, one vote, "equitable and effective" representation is to be understood in terms of "numbers of people," and in particular, whether each district has approximately the same "aggregate number of inhabitants" such that "each representative is subject to requests and suggestions from the same number of constituents."  *Id.* at 1127-29, 1132.  Indeed, one person, one vote *always* has been understood simply in terms of "numbers of people." *See id.* at 1127-32 (discussing the constitutional history of apportionment and the Supreme Court's one person, one vote jurisprudence).  Beyond that, there simply is nothing in *Evenwel* or any other case that Plaintiffs cite to suggest that courts can or should reach beyond the population numbers to assess whether in practice legislators in particular districts actually provide what their constituents find to be "effective representation."  To the contrary, such an inquiry involves the exact kind of "fundamental" questions about the "nature of representation" with which courts have "no constitutionally founded reason to interfere." *Burns*, 384 U.S. at 92; *Gaffney*, 412 U.S. at 749-51, 754.  *Evenwel* did nothing to upset—and in fact "reinforced"—that long standing principle. *Cranston*, 837 F.3d at 142-44.

Fourth, to the extent there is any doubt about whether *Evenwel*, *Burns* and *Gaffney* support Defendants' argument—which there should not be—*Cranston* dispels that doubt, as the First Circuit held in that case that "the methodology and logic" of those and other cases foreclose identical claims to those here.  *Cranston*, 837 F.3d at 137; *see id.* at 142-44.  Plaintiffs' attempts to distinguish *Cranston* border on frivolous, and the Court should reject them.

For example, Plaintiffs suggest that *Cranston* is distinguishable because the remedy sought in that case was to exclude prisoners from the apportionment base, whereas Plaintiffs here seek to reallocate prisoners to their district of origin.  Pl. Br. at 21.  That is entirely irrelevant.  Regardless of what remedy Plaintiffs seek, their ***legal claim*** (and their argument in support of it) is exactly the same as the legal claim in *Cranston*; namely, that counting prisoners where they are incarcerated violates one person, one vote because it: (1) "inflates the voting strength and political influence of the residents in [prison districts] and dilutes the voting strength and political influence of Plaintiffs and other persons residing [in non-prison districts]," in violation of the right to electoral equality; and (2) deprives residents in non-prison districts of representational equality because inmates do not have ties to the district where they are incarcerated, and do not receive effective representation therein.  *Compare Cranston*, 837 F.3d at 139-40 *with* Compl., ¶¶ 4-5, 8, 69, 77-78, 89-91.  The First Circuit's rationale for rejecting that legal claim in *Cranston* applies equally to Plaintiffs' identical claim in this case.

Relatedly, Plaintiffs argue that *Cranston* is distinguishable because it examined the effects of prison gerrymandering on non-prison districts generally, without considering the purported "double punch" that Plaintiffs claim to have suffered by having residents both "removed from Plaintiffs' districts *and* assigned to other districts."  Pl. Br. at 23.  By Plaintiffs' own admission, however, this argument again speaks to the extent of their alleged injury and the

7

nature of the relief they seek.  *Id.* (arguing that this distinction means Plaintiffs "can secure full relief only by having prisoners properly counted in their districts of origin—not removed from the apportionment base").  By contrast, Plaintiffs cite no legal authority to demonstrate that this distinction requires a different legal analysis to determine whether Plaintiffs are entitled to relief in the first place.  And Plaintiffs provide no coherent rationale for why that should be the case.

Continuing to grasp at straws, Plaintiffs argue that *Cranston* is distinguishable because it involved municipal prison gerrymandering instead of gerrymandering in the state legislature.  Pl. Br. at 23.  But again, Plaintiffs do not cite any case or provide any argument to demonstrate why that makes a legal difference.  And they cannot do so, as the framework is the same in both contexts.  *Compare Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 674 (5th Cir. 2009).

In addition, Plaintiffs argue that *Cranston* is distinguishable because, unlike the plaintiffs in that case, Plaintiffs do not have the political power to remedy their alleged injuries through the political process.  Pl. Br. at 24, citing 837 F.3d at 144.  But Plaintiffs once again do not cite any legal authority or provide any legal argument to demonstrate why that makes a legal difference.  Moreover, the First Circuit did not even arguably suggest in *Cranston* that the availability of a political remedy was necessary to that court's legal analysis.  To the contrary, the First Circuit referenced the availability of a political remedy only ***after*** it had determined that Plaintiffs' "unusual" claim lacks merit, and it did so only to highlight that its rejection of the claim is made all the more "obvious" by the political realities surrounding it.  *Cranston*, 837 F.3d at 144.

In any event, Plaintiffs have the same political remedies that the plaintiffs had in *Cranston*.  Plaintiffs concede that only a small minority of legislative districts in Connecticut have prisons.  Just like in *Cranston*, therefore, residents in the vast majority of districts throughout the state incur the same kind of alleged vote dilution that Plaintiffs claim to have

suffered, even if the degree of Plaintiffs' alleged injury is heightened compared to residents in rural non-prison districts due to the purported "double punch" that Plaintiffs claim to have incurred. If residents in both rural and urban non-prison districts collectively wish to rectify the situation, therefore, they can do so through the political process.

Fifth, and finally, Plaintiffs erroneously claim that this case is controlled by *Mahan v. Howell*, 410 U.S. 315 (1973). *See* Pl. Br. at 12-14. The *Cranston* plaintiffs made the exact same argument, and the First Circuit flatly rejected it. 837 F.3d at 145. This Court should reject it too.

In *Mahan*, the legislature divided two cities into three districts with equal populations. In relying on census numbers to calculate the population for those districts, however, the legislature improperly counted roughly 18,000 Navy personnel as residents of the district in which their ship was berthed, even though there was no dispute that many of those individuals actually lived in different and adjoining districts. In those "unusual, if not unique, circumstances," the Supreme Court required reapportionment to eliminate the "discriminatory treatment" of military personnel that resulted from such miscounting. *Mahan*, 410 U.S. at 331-32.

As *Cranston* correctly held, *Mahan* is "easily distinguishable" because: (1) prisoners are not being mistakenly counted in a district where they did not live and sleep at the time the census was taken; and (2) Plaintiffs have not alleged the same kind of deliberate "discriminatory treatment" that flows from that kind of miscounting. *Cranston*, 837 F.3d at 145.

Further, and more importantly, in deciding *Mahan* the Supreme Court did not conduct anything close to the kind of substantive inquiry into the "nature of representation" that Plaintiffs request here. Nor did *Mahan* purport to overrule or cast doubt on the established rule that courts simply have no constitutional authority to second guess the legislature's choice of population base absent a showing of discriminatory intent. To the contrary, the Supreme Court reaffirmed

that rule in *Gaffney*, which the Court decided four months ***after*** it decided *Mahan*. *Mahan* therefore does not support the meaning that Plaintiffs ascribe to it. Rather, *Mahan* stands for nothing more than the unremarkable proposition that states cannot arbitrarily count individuals as residents of a district in which they indisputably do not live and sleep when the census is taken. That concern simply is not implicated here.

## II.     THE ELEVENTH AMENDMENT APPLIES

Plaintiffs admit that they must allege an ongoing violation of federal law in order to invoke the *Ex Parte Young* exception to the Eleventh Amendment. Pl. Br. at 25; *see, e.g., In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007). Because Plaintiffs have not adequately alleged such a violation, *Ex Parte Young* does not apply and the Eleventh Amendment bars their claim. *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland* does not compel a different conclusion. *See* Pl. Br. at 26. In that case the Supreme Court held that, in conducting the *Ex Parte Young* analysis, courts do not resolve the merits of an ongoing violation of federal law ***that has been adequately pled***. 535 U.S. 635, 646 (2002), citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997) ("An ***allegation*** of an ongoing violation of federal law . . . is ordinarily sufficient") (emphasis in original). However, when an ongoing violation of federal law has ***not*** been adequately alleged—as is the case here—the Eleventh Amendment plainly bars the claim. *E.g. City of Shelton v. Hughes*, 578 F. App'x 53, 55 (2d Cir. 2014).

In any event, even if the Eleventh Amendment somehow does not apply, the Complaint nevertheless fails to state claim for all of the same reasons. The Court should therefore dismiss the Complaint on that independent basis.

## CONCLUSION

The Court should dismiss this case with prejudice.

       Respectfully submitted,

       DEFENDANTS DENISE MERRILL AND
       DANNEL P. MALLOY

       GEORGE JEPSEN
       ATTORNEY GENERAL

BY: */s/ Michael K. Skold*
       Michael K. Skold (ct28407)
       Maura Murphy Osborne (ct19987)
       Assistant Attorneys General
       Office of the Attorney General
       55 Elm Street
       Hartford, CT 06106
       860-808-5020 (phone)
       860-808-5347 (fax)
       Michael.Skold@ct.gov
       Maura.MurphyOsborne@ct.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2018, a copy of the foregoing was electronically filed. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Michael K. Skold*
Michael K. Skold
Assistant Attorney General